Henry T. McMILLAN, et al., Plaintiffs,

v.

ESCAMBIA COUNTY, FLORIDA, et al., Defendants.

No. PCA 77–0432.

United States District Court,
N.D. Florida,
Pensacola Division.

March 11, 1983.

James U. Blacksher and Larry T. Menefee, Mobile, Ala., for plaintiffs.

Paula G. Drummond, County Atty., Pensacola, Fla., Thomas Silverstein, Charles S. Rhyne, Washington, D.C., for defendants.

## MEMORANDUM DECISION

ARNOW, Senior District Judge.

This cause is before this court on remand from the Court of Appeals for the Fifth Circuit, 688 F.2d 960 (5th Cir.1982). The decision of the Court of Appeals affirms a remedial plan adopted by this court in 1979 and, in view of the passage of time, instructs this court to revise the scheduling terms of its remedial order, 688 F.2d at 973. Defendants' petition for a stay has been denied by both the Court of Appeals and a justice of the Supreme Court of the United States.

By letter dated November 29, 1982 this court instructed the parties to submit proposed election plans and schedules on or before December 21, 1982. Plaintiffs and defendants submitted their respective proposals and this court conducted a hearing on December 28, 1982 at which the parties were given the opportunity to be heard in oral argument in support of their proposals.

In its return of the case to this court, the Court of Appeals remanded with instructions to revise the scheduling terms of the remedial order. However, all parties, including the defendant Supervisor of Elections, agreed that, in light of the intervening 1980 federal decennial census, the single-member district boundaries contained in this court's 1979 order are now malapportioned on a population basis.

To this court, the Court of Appeals' decision has established the law of this case. However, one of the exceptions to the law of the case doctrine is where the evidence on a subsequent trial is substantially different. *White v. Murtha,* 377 F.2d 428 (5th Cir.1967); *U.S. v. Robinson,* 690 F.2d 869 (11th Cir.1982); *Baumer v. U.S.,* 685 F.2d 1318 (11th Cir.1982).

Evidence now presented respecting malapportionment requires revision of the division boundaries in its prior order to provide compliance with the one-person one-vote rule.

At the hearing on December 28, 1982 all parties were in agreement also about the timetable for conducting new elections in the fall of 1983, citing substantial practical difficulties in holding county commission elections at the same time as Pensacola city elections in the spring of 1983 or holding county commission elections shortly thereafter in the summer of 1983.

However, they disagreed sharply over the form of the election scheme that should be included in this court's order. Plaintiffs urged this court to order county commission elections held pursuant to the five single-member district plan adopted for the Escambia County School Board by order dated July 1, 1982.[1] Defendants, on the other hand, contended that the elections should be held on an at-large basis utilizing residence subdistricts that had recently been drawn by the county commissioners pursuant to the authority provided them by the general law of Florida governing at-large county commission elections. At the hearing on December 28, 1982, and at a conference in chambers following the hearing, additional problems and questions were suggested concerning a draft order that had been proposed by the court.

It had been suggested that, unless there was some legal reason why such could not be done, it would be well for the five county commission districts to conform to the boundaries of the election districts of members of the Escambia County Board of Education. The thought advanced was that such would probably make for less voter confusion and, in addition, would probably be easier for the election officials in setting up elections.

This was done in the court's order of December 3, 1979, approved on appeal; the same districts for the five member Board of County Commissioners as approved were

1. Subsequently, they suggest minor changes to reduce population variances.

the same as those previously approved for the Escambia County Board of Education.

Because of population changes, disclosed by the 1980 decennial census, heretofore the Escambia County School Board submitted to this court a revised election plan. This court on hearing concerning it found that it complied with constitutional and legal requirements and that it should be adopted. In drafting the suggested order for the county commission this court included the same five districts as suggested for the school board.

At the court's direction, because of these various matters, the parties were directed to present in writing their comments and objections to this court's proposed order. In addition, following receipt of such, a further hearing was held at which evidentiary matters have been presented either by stipulation or by evidence.

In its decision of September 24, 1979, this court held that, under what it believed was the controlling rule in *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978), the defendant County Commission could not present to this court an election plan designed to remedy the constitutional violation this court had found to exist because it had no legislative authority to enact such a plan. In its decision on rehearing, affirming this court, the Court of Appeals for the Fifth Circuit agreed.

*McDaniel v. Sanchez*, 425 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), was rendered after this court's decision of September 24, 1979, but prior to the decision on rehearing of Fifth Circuit. It was not mentioned in the appellate court's decision for rehearing and, so this court is advised, the parties to the appeal did not call it to the appellate court's attention.

In *McDaniel*, the court, discussing both Justice White's opinion and Justice Powell's opinion in *Wise*, said;

Neither East Carroll nor Wise decided the precise question that is now presented. Nonetheless, both Justice White's opinion and Justice Powell's opinion surely foreshadowed the holding we announce today. For both opinions indicate that the fact

that the reapportionment plan before us was devised in response to an order of a federal court does not change its character as a legislative plan. In addition, Justice Powell's opinion indicates that the Commissioners Court's power under Texas law to adopt this plan should be irrelevant to the decision in this case.

Further in the opinion the court said:

The application of the statute also is not dependent upon any showing that the Commissioners Court had authority under state law to enact the apportionment plan at issue in this case. As Justice Powell pointed out in *Wise v. Lipscomb*, 437 US 535, 57 L Ed 2d 411, 98 S Ct 2493, the essential characteristic of a legislative plan is the exercise of legislative judgment. The fact that particular requirements of state law may not be satisfied before a plan is proposed to a federal court does not alter this essential characteristic.

The decision also pointed out that Justice Powell disagreed with Justice White's suggestion that *East Carroll* [*Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296] had held that a proposed reapportionment plan may be considered legislative only if the legislative body that suggested the plan had authority to enact it under state law and stated that "In Justice Powell's view, the legislative body's authority under state law was irrelevant to the question before the court. He explained that the critical difference between a legislative plan and a court imposed plan for purposes of substantive review was that the former reflected the policy choices of the elected representatives of the people, whereas the latter represented the remedial directive of a federal court. Deference to the judgment of the legislative body was required even if that body lacked authority under state law to adopt the proposed reapportionment plan." 425 U.S. at 144, 101 S.Ct. at 2233, 68 L.Ed.2d at 736.

It appeared to this court that, under *McDaniel*, this court and the appellate court

were wrong in concluding defendants might not present to this court an election plan that was not entitled to legislative deference because they were without legislative power to enact it. When such was announced at a hearing on February 9, 1981, counsel for plaintiffs disagreed; counsel for defendants were uncertain about it.

At the court's request, the parties have submitted memoranda going into the meaning and effect of *McDaniel* as well as the question whether, since *McDaniel* was not a decision subsequent to the Fifth Circuit's decision holding the defendants' plan may not be considered as legislative, the law of this case has been established so that any holding of *McDaniel* may be disregarded.

In memorandum, plaintiffs point out *Wise* involved the question whether a court should defer to a local government's proposal to adopt an election plan that includes multi-member districts or at-large seats and *McDaniel* involved the question whether a local government's proposal to change the boundaries of a court ordered single-member district plan should be precleared under the Voting Rights Act before it is considered by the court.

Plaintiffs' contention is that *McDaniel* is limited to the "narrow, statutory" question concerning section 5 of the Voting Rights Act of 1965 and that it did not overrule *Wise.*

Defendants, not surprisingly, now contend that it appears in *McDaniel* the Supreme Court has determined that Justice Powell's analysis controls the determination whether a remedy is or is not a "legislative plan". In addition to *McDaniel,* they cite *Hughley v. Adams,* 667 F.2d 25 (5th Cir. 1982) and *Edge v. Sumter County School District,* 541 F.Supp. 55 (M.D.Ga.1981).

■ To this court, in *McDaniel* the Supreme Court went beyond *Wise.* It adopted Justice Powell's view, as set forth in his concurring opinion in *Wise,* and said that, where a reapportionment plan is devised in response to an order of a federal court, it is entitled to deference as a legislative plan regardless whether the body presenting it lacked the authority under state law to adopt it.

It is, of course, correct that the issue involved in *McDaniel* was a question of preclearance under the Voting Rights Act. But the court itself, in reaching its conclusion, pointed out that it drew significant guidance from prior cases in which the substantive acceptability of a reapportionment plan, rather than applicability of section 5, was at issue. Justice Powell's concept as a principle has equal force whether it is applied in a voting dilution suit or in a section 5 preclearance suit.

Plaintiffs contend that the law of the case is established in *McMillan v. Escambia County,* 688 F.2d 960 (5th Cir.1982), in which the Court of Appeals affirmed this court's analysis of the remedy issue, and that the holding requiring a court-ordered plan using single-member districts exclusively has finality as the law of the case.

Cited in support is the statement contained in 1B *Moore's Federal Practice* § 0.404(10), p. 573 n. 15 (citation omitted):

The Supreme Court stated the general rule at an early date in this matter: "whatever was before the Court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it upon any matter decided on appeal for error apparent; nor intermeddle with it, further than to settle so much as has been remanded."

Pointing out a clear exception to the rule is that "A federal court must apply new and supervening rule of—federal law to the decision of federal issues when the new legal rule is valid and applicable to the issues of the case" plaintiffs also point out that *McDaniel* was not an intervening case. This case was decided on June 1, 1981 and Fifth Circuit entered its judgment on rehearing on September 24, 1982.

■ Defendants do not quarrel with the application of the law of the case doctrine to this case. Instead, citing such cases as *White v. Murtha,* 377 F.2d 428 (5th Cir. 1967), *U.S. v. Robinson,* 690 F.2d 869 (11th Cir.1982), *Baumer v. U.S.,* 685 F.2d 1318 (11th Cir.1982), defendants point out that a decision by an appellate court must be followed in the trial court on appeal unless one of three exceptions applies and that one of these exceptions is where a decision is clearly erroneous and would work a manifest injustice. They contend that in order to avoid an incorrect and unjust result this court may, and, indeed, should, reconsider the remedy issue.

The fallacy in that contention is that the defendants, though given opportunity, have not shown the decision, if erroneous, works a manifest injustice.

The plan the court ordered into effect on December 3, 1979, and that was approved on appeal, contained one of five districts with a majority in black population and registered voters. As blacks constituted approximately 20% of the county's population and 17% of its registered voters, the plan was arranged so as to provide them with an opportunity to elect membership to the commission in proportion to their population percentage.

The plan proposed by defendants in 1979 called for a seven member commission with five single-member districts and with two members elected at-large. The proposed seven member commission would, at most, provide blacks with an opportunity to elect 14% rather than 20% of the commission's membership. It would not provide an adequate remedy for the unconstitutional vote dilution found to exist in this case.

There is another reason why the seven member commission plan should not have been placed into effect by this court.

From *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2355, 37 L.Ed.2d 335, 346 (1973).

In fashioning a reapportionment plan or in choosing among plans a district court should not preempt the legislative task nor "intrude upon state policy any more than necessary." *Whitcomb v. Chavis,* 403 U.S. 124 [160, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363].

■ Article 8, § 1 of Florida's constitution provides that, except when otherwise provided by county charter, the governing body of each county shall be a board of county commissioners composed of five members serving staggered terms of four years.

Escambia County has no county charter. As the record shows, its voters, during the pendency of this suit, rejected a county charter proposal. That proposal included a proposal to establish a seven member commission with five to be elected from single-member districts and two to be elected at-large.

These defendants, in proposing a seven member commission, contravene the five member state policy and, apparently, go also contrary to the will of the people of Escambia County as evidenced by their rejection of the county charter. Any legislative deference that should be given to any plan proposed by these defendants should not include accepting their proposal of a seven member commission.[2]

In short, while the reasoning of this court, and of the appellate court, may have been erroneous, the conclusion was correct. There is no manifest injustice here to be considered or corrected and no exception to the doctrine of the law of the case to be applied.

As plaintiffs point out, this court has no choice but to carry out the mandate of Fifth Circuit.

At the hearing on February 9, 1983, following this court's announcement concerning *McDaniel,* defendants requested and were given time to present another plan and further hearing was scheduled for March 10, 1983.

**2.** This also applies to the two seven member proposals of these defendants now before this court.

At the March 10, 1983 hearing defendants presented for consideration not one but two plans. Counsel for defendants stated in effect that any other plans theretofore presented by defendants were withdrawn and need not be considered by the court.

Counsel for plaintiffs stated the only plan now presented for consideration by the plaintiffs was the amended plan containing the .5% population deviation previously tendered by plaintiffs.

The defendants' plans call for a seven member county commission, with five to be elected from single-member districts, and two to be elected at-large. Plan A contains no district having a majority of black population and registered voters, and Plan B contains one district having a black majority in population and registered voters.[3] The maximum population deviation in Plan A is ± 2.8% and in Plan B ± 4.4%.

Neither plan complies with the five member single-district plan, with one district having a majority in black population and registered voters approved and to be put into effect under Fifth Circuit's decision, and both are rejected.

On the merits, they are also rejected as not providing adequate remedy for the constitutional violation found to exist. Submitted for preclearance under 42 U.S.C. § 1973a(c), they would be denied preclearance because defendants have not on the record carried the burden on them of showing that they do not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, because they contain the constitutional vices found to exist in the defendants' plan in this suit, and because they violate section 2 of the Voting Rights Act.

One of the seven member plans— Plan A—preferred by defendants, makes not even a pretense of affording any district in which there is a majority of black population and registered voters. The other one contains one such district. But it calls for a seven member commission and thus dilutes, in violation of the constitution and section 2 of the Voting Rights Act, the voting strength of the black minority. The record in this case establishes blacks, in order to prevent unlawful dilution, should have reasonable opportunity to elect 20% of the commission. This Plan B gives them such opportunity to elect only 14% of the commission. In addition, as pointed out, both plans, in suggesting a seven member commission, go contrary to state policy.

Plaintiffs present a plan that has minimal changes from the previously approved school board plan. It does involve splitting or dividing two precincts; evidence at hearing establishes this presents no real problem to election officials. It has an overall maximum population deviation of only .5%. It provides for a five member commission, each elected from a single district and with one district containing a majority in black population and black registered voters. It complies with the one-person, one-vote rule and avoids diluting the potential voting strength of the blacks. It contains the method of preserving the staggered term feature all parties have agreed is appropriate.

As pointed out, defendants' tendered plans must be rejected because they do not comply with the mandate of Fifth Circuit. They should be rejected on the merits, and they may not be precleared under section 3 of the Voting Rights Act. However, Plan B does contain one district with a black population and registered voter majority, and has five districts.

So far as this court is advised, there are no major differences between the boundary lines proposed by Plan B and those proposed by plaintiffs. But its maximum population deviation is ± 4.4%.

*Wyche v. Madison Parish Police Jury,* 635 F.2d 1151 (5th Cir.1981), points out that in devising a reapportionment plan a court is held to equitable standards of vot-

---

3. Percentage figures, based on the 1980 census, are close to those before the court in 1979. Under 1980 figures, blacks constituted 19.7% of the total population and 15% of the registered voters.

ing equality more stringent than those governing a legislature. "Although the mathematical precision required for congressional districting is not a prerequisite, unless there are persuasive justifications, articulated by the court, a judicially-mandated reapportionment plan must ordinarily achieve the goal of population equality 'with little more than de minimis variation." Cases cited—page 1159.

There is no persuasive articulation that may be justified in not adopting the plan proposed by plaintiffs. Defendants' counsel point out their Plan B was presented only in connection with the 7 member plan. They did not urge the use of its boundaries if a five member single-district plan were chosen.

Plaintiffs' proposed districts do have the desirable features of conforming closely to the five districts in effect for election of the five members of the Escambia County School Board from single member districts, although Plan B boundaries also closely conform.

█ On balance, this court concludes it should place in effect the plan proposed by plaintiffs.

Because of contentions presented respecting it, discussion of the Voting Rights Act and its application in this case may be in order.

The prior order of this court, approved on appeal, incorporated for a period of time provisions of section 3 of the Voting Rights Act, 42 U.S.C. § 1973a(c).

█ Plaintiffs, citing *McDaniel v. Sanchez,* 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), and *U.S. v. Board of Supervisors,* 429 U.S. 642, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977), contend that these defendants may not have consideration by this court of the resident district boundaries adopted by them until there has been preclearance of them under 42 U.S.C. § 1973c.

That contention is without merit. As these cases point out, they dealt with political subdivisions covered by the act and to which section 5 of the act—42 U.S.C. § 1973c—applies. There is not dealt with in this case a political subdivision covered by the act and section 5 has no application to this suit.

However, as pointed out, 42 U.S.C. § 1973a(c) is applicable here. Its preclearance terms were included in the remedial order of this court that has been approved by the Court of Appeals.

Under *Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973), as *McDaniel* points out, a reapportionment plan is a "standard, practice or procedure with respect to voting" within the meaning of section 5. The exact language is also contained in 42 U.S.C. § 1973a(c). Under that decision the plan here proposed is a "standard, practice or procedure with respect to voting" under 1973a(c) so that the provisions of that act are applicable to it.

Under *Georgia,* and cases cited in it, the right to vote can be affected by a dilution in voting power as well as by an absolute prohibition when casting a ballot.

Respecting the effect of section 3 of the Voting Rights Act in this case both parties cite *Beer v. U.S.,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), and make different contentions respecting the retrogression principle as applicable to this case. Defendants also cite *Lockhart v. U.S.,* —— U.S. ——, 103 S.Ct. 998, 74 L.Ed.2d 863 (1983).

These cases dealt with section 5 and not section 3 of the Voting Rights Act. No cases have been cited or found dealing with section 3.[4]

*Beer,* construing section 5, held that its purpose was to insure that no voting procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effec-

4. An explanation for this is found in the congressional history given in No. 5, July 1982, U.S.Code Congressional & Administrative News, p. 193, footnote 44. According to that footnote, apparently only two counties—Escambia County, Florida and Thurston County, Nebraska—are covered by the preclearance provisions of section 3(c) as the result of court order.

tive exercise of the electoral franchise. It stated that the language of section 5 applied only to proposed changes in voting procedures and that discriminatory practices instituted prior to November 1964 are not subject to preclearance under it. It concluded that a new legislative apportionment scheme which enhances the position of racial minorities cannot violate section 5 unless the new apportionment itself so discriminates on the basis of race or color so as to violate the United States Constitution.[5]

*Lockhart* held that, since the new plan under consideration did not increase the degree of discrimination against blacks, it was entitled to section 5 preclearance.

As the parties point out, much of the language in section 3 is identical to that in section 5 but to this court there are significant differences between the two sections.

Section 5 has language referring to standards, etc., different from those in effect on particular dates. It is applicable to covered political subdivisions and applies regardless whether a suit is pending. It is intended only to prevent retrogression, at least as the Supreme Court has construed it.

As Justice Marshall points out in the dissenting opinion in *Lockhart,* the court in *Beer* relied on a committee report dealing with section 5; the report did not deal with section 3 nor has this court found any such report dealing with section 3.

■ Section 1973a(c) applies to situations such as the one found here—in which a court has found in a suit a violation of the fourteenth or fifteenth amendments justifying equitable relief. It does not come into play until that situation is presented. Its reference is to any standard, etc., different from that in force and effect at the time the suit was commenced.

■ To this court that provision of the act involves no retrogressive principle. It means exactly what it says. Applied to this case, the plan adopted by the defendants, pursuant to Florida's reapportionment law following a 1980 census, for example, must be precleared before being effective.[6] It must be precleared because it is a change from the standard in effect at the time the suit was instituted and it may not be precleared unless the court finds that it does not have the purpose and will not have the effect of denying the right to vote on account of race or color.

In making that determination the court does not compare that plan with defendants' plan in effect at the time this suit was commenced and find that it does not violate the requirements of section 3 if it is no worse than that plan.

If that were the purpose of section 3, for example, defendants could adopt almost any form of discriminatory voting practice, and it would not be subject to preclearance, because it would not be worse discrimination than the plan here found to be invalid. Only if such practice was also unconstitutional or violated section 2 would it be subject to the preclearance test of section 3.

As pointed out in *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), the Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting which had infected the electoral process in parts of the United States for nearly a century. The case, referring to House and Senate reports, states that "in many of the political subdivisions covered by paragraph 4(b) of the act voting officials have persistently employed a variety of procedural tac-

---

5. A portion of footnote 31, found at p. 189, No. 5, July 1982, U.S.Code Congressional & Administrative News, reads as follows:

Under the rule of *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), a voting change which is ameliorative is not objectional unless the change "itself so discriminates on the basis of race or color as to violate the Constitution." 425 U.S. at 141, 96 S.Ct. at 1364; *see also* 142 n. 14, 96 S.Ct. at 1364 n. 14

(citing to the dilution cases from *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 through *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314). In light of the amendment to section 2, it is intended that a section 5 objection also follow if a new voting procedure itself so discriminates as to violate section 2.

6. As must other plans proposed by defendants.

tics to deny negroes the franchise often in direct defiance or evasion of federal court decrees". 383 U.S. at 336, 86 S.Ct. at 822–23, 15 L.Ed.2d at 791.

The Department of Justice has used its objection power to present it to a South Dakota law that would have nullified the effect of a judicial decision. No. 5, July 1982, U.S.Code Congressional & Administrative News, at 188.

 Unlike section 5, section 3 was not designed to preserve the status quo. To the contrary, section 3 was designed to deal with a situation such as that here presented. It was designed to prevent a political subdivision found in violation of the constitution from performing an end run around and circumventing the court's holding by enacting a new voting plan that was no worse than the one in effect at the time the suit was instituted. The retrogression principle made applicable in section 5 has no place and plays no part in section 3.

From the congressional history found in 1965 U.S.Code Congressional & Administrative News, in discussion of 3(c) at page 2455:

Subsection 3(c)—This proviso is intended, by providing for judicial scrutiny of new or changed voting requirements, to insure against the enaction of new and onerous discriminatory voting barriers by state or political subdivisions which have been found to have discriminated.

The Congress did not intend by enactment of this section to prevent a political subdivision from making election changes, even though its election scheme in effect at the time of suit violated the constitution. But, it did intend that any change would not present a new and onerous discriminatory voting barrier.

Beyond that, however, if *Beers* is authority for applying retrogression principles to section 3 then, under *Beers,* the plan must be found to violate section 3 if it so discriminates on the basis of race or color as to violate the constitution. The congressional history of the 1982 Voting Rights Act amendments points out it must also be found to violate section 3 if it violates section 2 of that act.

Defendants, though contending preclearance is not required, say that if preclearance under section 3 is required no additional evidence need be taken and that this court may make decision on the record before it.

On the record, as previously pointed out, defendants' plans do violate the constitution and section 2 of the Voting Rights Act, so that preclearance under section 3 should be and is denied.

Defendants contend that, in devising an election plan of five districts, one of which contains a majority of black population and registered voters, blacks have been guaranteed proportionate representation in violation of the constitution.

 To this court that argument borders on the absurd. The remedial plan of this court, approved on appeal, contains such a district. Obviously, a district in which blacks have a majority in population and in registered voters does not guarantee the election of blacks and does not violate the constitution. To the contrary, under the factual situation in this case, it is the only effective remedy this court was able to devise to remedy the unconstitutional vote dilution here found to exist.

In another contention, defendants say that the retrogressive base line in this case is not the boundaries provided by this court's order of December 3, 1979 because the Fifth Circuit did not affirm the boundaries in that order. The contention, as this court understands it, is that the county reapportioned during the period between the appellate court's reversal of this court and its affirmance on rehearing.

In this decision this court has expressed its views on the question of retrogression under section 3 of the Voting Rights Act. Respecting this contention, however, it points out that, while the appellate court first reversed this court in its remedial order, on petition for rehearing it affirmed. Its mandate was not issued until November 23, 1982; its prior reversal decision was

never in effect. The remedial order entered by this court in 1979 has been valid since 1979 and in effect during all the period of time although stayed by court action while the case was on appeal.

In summary, the mandate of the appellate court to this court requires it to proceed to place into effect the remedial order previously approved with its scheduling terms revised in view of the passage of time. That is the law of this case. Under an exception to the doctrine, because of the evidence now before the court showing malapportionment under the 1980 census, that malapportionment should be corrected.

Defendants contend the manifest injustice exception to the law of the case requires this court to revisit its rejection of the seven member plan proposed by defendants in 1979. But defendants have established no manifest injustice. If this court and the appellate court's ground for rejecting it as unauthorized was erroneous, nonetheless the conclusion reached that it should be rejected was correct.

If the law of the case does not control, it still remains the plans presented by defendants must be rejected. For reasons pointed out in the decision, they may not be precleared under 42 U.S.C. § 1973a(c). They do not provide adequate remedy for the constitutional violations found to exist. So far as they propose seven member commission, they violate Florida's state policy.

Any deference to be accorded them as legislative plans submitted in response to a court order or request does not extend to approving their violation of state policy. In any event, legislative deference, in view of their constitutional vices and Voting Rights Act violations, would not permit their approval.

Other contentions of defendants are without merit.

The amended remedial plan proposed by plaintiffs, containing minimum population deviations, and updated and conforming otherwise to the plan approved by the appellate court, should be adopted by this court.

Finally, in this perhaps too lengthy decision, this court has endeavored to make decision respecting every contention able and ingenious counsel have presented to it. It has done so even though its law of the case conclusion may have mooted some of these contentions.

This case has been pending too long. With elections stayed, no elections have been held for several years. Defendant public officers are holding over as de facto officials beyond their terms of office.

Defendants have appealed before and this court anticipates they will appeal again.

In the untoward event the appellate court disagrees with this court's law of the case conclusion, it may feel other contentions must be resolved.

Sometimes, when a trial judge leave unanswered contentions on the record going to the appellate court, that court is constrained because of necessity or desirability to remand for the trial court's answers. Hopefully, this court has avoided the possibility of such here occurring.

The amended remedial plan proposed by the plaintiffs, will be put into effect by order of the court.