**TALLAHASSEE BRANCH OF NAACP, et al., Plaintiffs-Appellants,**

v.

**LEON COUNTY, FLORIDA, et al., Defendants-Appellees.**

No. 86–3464.

United States Court of Appeals, Eleventh Circuit.

Sept. 21, 1987.

Robert E. Weisberg, Lipman & Weisberg, David M. Lipman, Miami, Fla., for plaintiffs-appellants.

F.E. Steinmeyer, III, Vickers & Muldoon, Tallahassee, Fla., Katharine I. Butler, University of South Carolina, College of Law, Columbia, S.C., for defendants-appellees.

Before GODBOLD and HILL, Circuit Judges, and ESCHBACH[*], Senior Circuit Judge.

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

HILL, Circuit Judge:

This appeal presents the narrow question of whether the reapportionment plan at issue was legislatively enacted or judicially imposed. In this case, county commissioners for Leon County, Florida (defendant-appellee) enacted a reapportionment plan which clearly complies with the Voting Rights Act and the United States Constitution. The plaintiff-appellant (NAACP) argues that because this plan was not adopted by a referendum as required by Florida law, the plan was not legislatively enacted; therefore the plaintiff contends that judicial precedent, not the constitution or the Voting Rights Act, requires the reapportionment plan be composed solely of single member districts. Thus, this is not a case in which it is alleged that the district court erred by permitting elections to be conducted in a manner which diluted the voting rights of minorities. Rather, appellant merely contends that the remedy which it proposes—election of county commissioners from single member districts—is the remedy required by binding precedent.

This suit was initiated by black voters of Leon County, Florida, under section 2 of the Voting Rights Act, 42 U.S.C. § 1973 (1982). A continuance of the trial was granted to allow the county to submit an election plan to the electorate in which four county commissioners were to be elected by single member districts and three were to be elected at large. This plan was rejected by the voters. The county proceeded to concede liability in the present suit. After the district court held that the county's at-large election system was in violation of the Voting Rights Act, the county commission enacted a reapportionment plan in which five commissioners were to be elected from single member districts and two were to be elected at large. Under state law, the Leon County Commissioners did not have authority to implement such a change without a referendum. The district court concluded that this plan had been legislatively enacted and therefore "enti-

tled to the deference normally afforded legislative judgment in apportionment matters."

■ Although both plans presented to the district court comply with the constitution, when a reapportionment plan is judicially imposed by the district court, single member districts are preferred. *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975). On the other hand, when a reapportionment plan is drafted by a legislative body of the state, the plan is not always required to be restricted to single member districts.

When a reapportionment plan is prepared by the district court, "equitable considerations demand a close scrutiny and mandate the fashioning of a near-optimal apportionment plan." *Seastrunk v. Burns,* 772 F.2d 143, 151 (5th Cir.1985). Generally, single member districts are viewed as providing such an optimal remedy. The rationale of the Supreme Court creating this preference for single member districts was set forth in *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977).

■ A reapportionment plan enacted by a state legislative body, however, is not scrutinized by the exacting standards used in evaluating a judicially imposed plan. Federal courts have long recognized that it is the function of state legislatures to conduct election proceedings. Only when the state is unable or refuses to reapportion itself in accordance with federal law will a federal district court undertake reapportionment. Accordingly, federal courts must defer to the judgment of a state legislative body in the area of reapportionment. Principles of federalism and common sense mandate deference to a plan which has been legislatively enacted. First, the elected representatives of the people understand the existing political system and the changes which would result from reapportionment. Rarely, if ever, will the federal district court have the benefit of such insight. Second, political compromise can produce a voting system tailored to the city, county, or state to be reapportioned. The district court, however, is required blindly to lay voting lines with mathematical exactness. Third, federalism is preserved when reapportionment is performed by a legislative body of the state. Reapportionment produces a fundamental change in state government and affects who will represent the people. Consequently, that determination is best left to the people rather than the federal judiciary. For these reasons, a legislatively enacted plan may include multimember districts while a judicially imposed plan, absent persuasive justifications, should not.

■ Recognizing the deference to be given state legislative bodies, we must resolve whether the plan at issue was in fact legislatively enacted. Under Florida law, a county is unable to change the structure of the county commission in the absence of a referendum. Fla.Stat.Ann. § 124.011(1) (West Supp.1987). Thus, we must determine whether deference should be granted to a reapportionment plan proposed by the commissioners of Leon County even though the County Commission does not have the power under state law to reapportion itself. We begin with the Supreme Court's plurality opinion in *Wise v. Lipscomb,* 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978).

In *Wise,* the court considered whether a reapportionment plan submitted by the Dallas City Council was legislatively enacted or judicially imposed. At issue was whether the mixed plan (eight single member districts/three at large districts) proposed by the city council should be accepted by the district court or whether the court was restricted to single member districts. Justice White, announcing the judgment of the court, concluded that the Dallas City Council had the power to enact the proposed reapportionment plan. Although the Texas Constitution provided that a city charter could not be amended without a referendum, Justice White concluded that once the election provisions of the city charter were declared unconstitutional, then the council would be free, under Texas law, to enact an alternative reapportionment plan without the requirement of a referendum. Justice White therefore concluded the plan was legislatively enacted.

Significantly, Justice Powell (joined by the Chief Justice, Justice Blackmun, and Justice Rehnquist) concluded that whether the city council had authority under state law to enact the proposed plan was irrelevant. Justice Powell reasoned that whenever a reapportionment plan is submitted by the elected representatives of the people, that plan should be given deference:

[T]he plan proposed by the Dallas City Council in this case must be considered legislative, even if the council had no power to reapportion itself....

The essential point is that the Dallas City Council exercised a legislative judgment, reflecting the policy choices of the elected representatives of the people, rather than the remedial directive of a federal court. As we held in *Burns [v. Richardson*, 384 U.S. 73, 85 [86 S.Ct. 1286, 1293, 16 L.Ed.2d 376 (1966),] "a State's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause." This rule of deference to local legislative judgments remains in force even if, as in *Burns*, our examination of state law suggests that the local body lacks authority to reapportion itself.

*Id.* at 548, 98 S.Ct. at 2501 (Powell, J., concurring). The Supreme Court's later decision in *McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), implies that Justice Powell's concurrence has been adopted by a majority of the court.

In *McDaniel*, the court again considered the distinctions between legislatively enacted and court-ordered reapportionment plans. In considering whether a plan was judicially adopted for purposes of the pre-clearance provisions of section 5 of the Voting Rights Act, 42 U.S.C. § 1973c (1982), the court stated:

As Justice Powell pointed out in *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, the essential characteristic of a legislative plan is the exercise of legislative

judgment. The fact that particular requirements of state law may not be satisfied before a plan is proposed to a federal court does not alter this essential characteristic. The applicability of § 5 to specific remedial plans is a matter of federal law that federal courts should determine pursuant to a uniform federal rule.

*McDaniel*, 452 U.S. at 152–53, 101 S.Ct. at 2237–38. The court therefore concluded that the plan at issue was legislatively enacted regardless of whether the state legislative body possessed such authority under state law. *Id.* at 152 & n. 34, 101 S.Ct. at 2237 n. 34.

In contrast to *McDaniel v. Sanchez* stands the former Fifth Circuit's opinion in *McMillan v. Escambia County*, 688 F.2d 960 (5th Cir.1982), *vacated on other grounds*, 466 U.S. 48, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984). In *McMillan*, the Fifth Circuit held that a reapportionment plan proposed by Escambia County, Florida was not legislatively enacted, because the county commission lacked authority under state law to make such a change in the absence of a referendum. Factually, *McMillan* is indistinguishable from the present case. In *McMillan*, the district court found the county's at-large voting system to be in violation of the Voting Rights Act. While the suit was pending, County Commissioners adopted a reapportionment plan consisting of five single member districts and two at large districts. This plan was later rejected by the voters of Escambia County. Because this plan failed in the referendum, the district court proceeded to impose a plan consisting solely of single member districts. The Fifth Circuit affirmed, writing:

[Defendants (Escambia County)] argued that the Commission was not prohibited by state law from enacting a reapportionment scheme and that the Commission's proposal should be treated as a legislatively adopted plan irrespective of the voter's rejection of the measure in the referendum election....

. . . .

Applying [*Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978) (plurality)] to this case, we conclude that the plan proposed by defendant—Escambia County Commissioners does not meet the requirements for a legislatively adopted plan. . . . [T]he Florida Constitution expressly limits the legislative powers of the County Commission to those specifically authorized by state law. Hence, as the district court found, the Commission does not possess the legislative authority to reapportion itself even where the existing apportionment scheme has been held unconstitutional. On this ground, the district court correctly held that a judicially devised plan was necessary.

*Id.* at 971–72. At first glance, *McMillan* would appear to be binding precedent determinative of this appeal;[1] no subsequent decision of this court or intervening Supreme Court precedent has affected the validity of *McMillan*. Furthermore, *McDaniel v. Sanchez* was rendered one-year prior to *McMillan*. But see *McMillan v. Escambia County*, 559 F.Supp. 720, 723 (N.D.Fla.1984) ("[*McDaniel*] was not mentioned in the appellate court's decision for rehearing and, so this court is advised, the parties to the appeal did not call it to the appellate court's attention."), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). The Former Fifth Circuit's opinion in *McMillan*, however, was vacated and remanded by the Supreme Court for reconsideration in light of the 1982 amendments to the Voting Rights Act. *Escambia County v. McMillan*, 466 U.S. 48, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984) (per curiam). Although the Supreme Court's opinion did not criticize the rationale of the Fifth Circuit, the portion of the opinion regarding the remedy to be imposed was never rein-

stated on remand. Thus, the Fifth Circuit's opinion in *McMillan* has no binding precedential effect. *County of Los Angeles v. Davis*, 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 1384 n. 6, 59 L.Ed.2d 642 (1979) ("Of necessity our decision 'vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect. . . .'"). Although we are free to consider *McMillan* persuasive, we are not bound by that decision.

Writing on a clean slate, we conclude that the rationale of *McDaniel v. Sanchez* applies with "equal force whether it is applied in a voting dilution suit or in a Section 5 preclearance action." *McMillan v. Escambia County*, 559 F.Supp. 720, 724 (N.D. Fla.1983), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). First, we simply do not believe the Supreme Court would adopt different definitions of "legislatively enacted" for purposes of section 2 and section 5. This is particularly true in light of the fact that *McDaniel* is based upon cases in which the issue was whether the plan adopted by the district court could include at-large or multimember seats. Nothing in the opinion in *McDaniel* limits the effect of the decision to preclearance cases. Second, a broad definition of "legislatively enacted" leaves reapportionment to be performed by a legislative body of the state rather than the federal judiciary. This is not a case in which the legislative body is unwilling to draft an acceptable reapportionment plan.

The district court correctly concluded that the plan at issue was "legislatively enacted." Accordingly, the judgment is

AFFIRMED.

GODBOLD, Circuit Judge, dissenting:

Leon County's at-large election system violated § 2 of the Voting Rights Act, 42

---

**1.** The first appellate decision in *McMillan* was rendered by the Fifth Circuit on February 19, 1981. *McMillan v. Escambia County* (*Escambia I*), 638 F.2d 1239 (former 5th Cir.1981). The decision in *Escambia I* was subsequently considered on rehearing by a panel of the former Fifth Circuit on September 24, 1982. *McMillan*

*v. Escambia County* (*Escambia II*), 688 F.2d 960 (former 5th Cir.1982). As a decision of a non-unit panel of the former Fifth Circuit, we would be required to consider *Escambia II* as binding precedent had it not been vacated by the United States Supreme Court. *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir.1982).

U.S.C. § 1973 (1982). In their class action complaint plaintiffs asked the court to remedy this violation by ordering single-member districts. The county commission proposed as an appropriate remedy to be ordered by the court a "mixed" plan providing for five single-member districts and two commissioners elected at large. Plaintiffs conceded that the commissioners' proposed plan complied with § 2 of the Voting Rights Act. They contended, however, that the commissioners lacked authority under state law to change the election system without voter approval—approval which the commissioners did not secure—and therefore that the plan prepared by the commissioners was not a legislative plan within the meaning of the case law and thus not entitled to judicial deference. Rather, plaintiffs urged, the court was required to apply the principle that absent special circumstances a court-ordered plan must contain only single-member districts. The court found that the commissioners' mixed plan was legislative and thus accorded it deference, and on that basis ordered it put into effect as a court-ordered plan.

This court now agrees with the conclusion that the plan was legislative and therefore affirms the district court. I respectfully disagree with the conclusion that the plan was legislative and would remand the case to the district court for further proceedings under correct standards.

## I. The case law background

When a federal court declares an existing apportionment scheme unconstitutional it will, whenever practicable, afford the legislature a reasonable opportunity to meet constitutional requirements by adopting a substitute measure before the court will devise and impose a remedial plan of its own plan. *Wise v. Lipscomb,* 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978); *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975); *Connor v. Finch,* 431 U.S. 407, 414–15, 97 S.Ct. 1828, 1833–34, 52 L.Ed.2d 465 (1977). Such a new legislative plan is given deference by the court and may contain multi-member districts. If a plan is devised and ordered by the court, however, absent special circumstances the court must give preference to single-member districts. *Chapman,* 420 U.S. at 18–19, 26–27, 95 S.Ct. at 761–62, 765–66; *Wise,* 437 U.S. at 540, 98 S.Ct. at 2497; *Connor v. Williams,* 404 U.S. 549, 551, 92 S.Ct. 656, 658, 30 L.Ed.2d 704 (1972); *Connor v. Johnson,* 402 U.S. 690, 692, 91 S.Ct. 1760, 1762, 29 L.Ed.2d 268 (1971). This requirement recognizes that while multi-member districting is not per se unconstitutional, it does tend to have undesirable consequences.

A court-devised plan must meet more stringent standards than required of a legislature for several reasons. Redistricting, by its nature, is essentially a legislative task. *McDaniel v. Sanchez,* 452 U.S. 130 at 138, 101 S.Ct. 2224, 2230, 68 L.Ed.2d 724 (1981); *Wise,* 437 U.S. at 539, 98 S.Ct. at 2496; *Chapman,* 420 U.S. at 17–18, 95 S.Ct. at 761–62. Because the court lacks the political authoritativeness that a legislature can bring to the task, it must act circumspectly and in a manner free from any taint of arbitrariness or discrimination. *Wise,* 437 U.S. at 541, 98 S.Ct. at 2498; *Connor v. Finch,* 431 U.S. 407, 415, 97 S.Ct. 1828, 1834, 52 L.Ed.2d 465 (1977). Policies of federalism are implicated as well; absent constitutional infringement, state political policies as reflected through legislative action should be vindicated if possible by the federal court.

The act by a legislative body of submitting a proposed plan is not necessarily the equivalent of a legislative act of reapportionment. A legislative body whose statutory power to reapportion itself has been held unconstitutional may act under some circumstances to propose a plan. Indeed, a court may receive suggested plans from many groups and institutions within the community. But this does not answer the question of whether a public legislative body has proceeded in such a manner that its proposed plan is legislative as meant by

the law and therefore entitled to deference.[1]

In *Wise* the Supreme Court considered whether a reapportionment plan submitted to the court by the Dallas (Texas) City Council after the court declared the existing at-large system to be unconstitutional was a legislative plan or a court-imposed plan. Justice White, announcing the judgment of the Court and writing an opinion joined by Justice Stewart, concluded that a proposed reapportionment plan cannot be considered a legislative plan if the political body submitting it lacks the legal power to reapportion itself. He reasoned that the mere act by a legislative body of submitting a plan to the court is not the equivalent of a legislative act of reapportionment performed in accordance with the political processes of the community. *Wise*, 437 U.S. at 545, 98 S.Ct. at 2500.[2] In *Wise* Justice White found that, after the existing system was declared unconstitutional, the Dallas City Council was free to exercise its residual or penumbral legislative power by adopting a mixed plan. *Id.* at 544, 98 S.Ct. at 2499. In short, Justice White found that the commission did not *lack* authority, but rather *had* authority to reapportion itself. This conclusion was reached in a context in which:

(1) The record suggested no statutory, state constitutional, or judicial prohibition upon the authority of the legislative body to enact an election plan under the circumstances. *Wise* at 544 n. 8, 98 S.Ct. at 2499 n. 8. Thus, the city council was free to, and did, "exercise its legislative powers." *Id.* at 544, 98 S.Ct. at 2499 n. 8.

(2) Plaintiffs were unable to cite any authority supporting their contention that the Dallas City Commission exceeded its authority. *Id.*

(3) Since there was no provision for reapportionment for a home-rule city such as Dallas by some agency other than the city commission, the city would be permitted to reapportion itself where the time before the next election was too brief to permit approval of a new plan by referendum. *Id.*

(4) Dallas would be powerless to reapportion itself when the time before the next election was too short to approve a plan by referendum. *Id.*

(5) The district court held, and the court of appeals did not disagree, that in these circumstances the city commission did not exceed its legislative powers as governing body of Dallas. *Id.*

Justice Powell, joined by the Chief Justice and Justices Blackmun and Rehnquist, concurred in the conclusion that the plan adopted by the city commission was a legislative plan for purposes of federal court review but dissented on the ground that it was unnecessary to find that the city commission was "imbued with [such] power [to reapportion itself]" after the apportionment provisions of the city charter were struck down. As they saw it, the essential point was that the legislative body "exercised a legislative judgment reflecting the policy choices of the elected representatives of the people." *Id.* at 548, 98 S.Ct. at 2501.

Justice Marshall, joined by Justices Brennan and Stevens, dissented. Justice Mar-

---

**1.** One can think of many examples demonstrating why a legislative body acting without state authority, and in derogation of state authority, is not entitled to the benefit of legislative deference. Surely we would not grant deference to a plan adopted by a rump session of a legislative body, consisting of less than a majority, meeting in secret and without notice to those members not present.

**2.** The dissenters accept, as Justice White appears to do, that it is possible for a legislative body to act beyond "the usual course of its legislative responsibilities," *Wise*, 437 U.S. at 552, 98 S.Ct. at 2503 (Marshall, Brennan, and Stevens, JJ., dissenting), i.e., to merely submit a

suggested plan as any other party (or other institution in a community) might respond to a court's request for assistance. No one contends that this happened here. Rather Justice White concludes that the Council *did* have authority "to exercise its legislative powers." *Id.* at 544, 98 S.Ct. at 2499. The dissenters contend the Council did not exercise its legislative responsibilities at all. It seems obvious that if the legislative body is acting as a mere source for a suggestion and is not even attempting to exercise its power to legislate, its suggestion is not entitled to deference as legislative action.

shall agreed with Justice White that only election systems adopted by a governmental body pursuant to its valid legislative authority should be treated as legislative plans. *Id.* at 550, 98 S.Ct. at 2502 (Marshall, Brennan, and Stevens, JJ., dissenting). He dissented, however, on the ground that a legislative plan could not be created by a legislature's making a submission not in accord with valid state procedures governing legislative action. *Id.* at 553, 98 S.Ct. at 2504.

It seems to me that, applying the standards set out in Justice White's opinion, the action by the Leon County commissioners was not legislative.

## II. Florida law

To understand why the plan in this case is not legislative even under Justice White's standards one must examine the Florida structure of county government.

The Florida constitution provides for "charter" counties, Article VIII, § 1(g) and "non-charter" counties, Article VIII, § 1(f). Florida counties have no inherent powers but derive their powers from the sovereign state and are not independent governmental entities. *See, e.g., Amos v. Mathews,* 99 Fla. 1, 126 So. 308, 321 (1930); *Gessner v. Del-Air Corp.,* 154 Fla. 829, 17 So.2d 522 (1944) ("county commissioners have only such powers as are granted them by statute"). A "charter" county is established by the voters of the county adopting a charter. *Id.* § 1(c). A charter county government has broad general powers— "all powers of local government not inconsistent with general law, or with special law approved by vote of the electors." *Id.* § 1(g):

This entirely new subsection [subsection (g)] provides for the broadest extent of county self-government or "home rule" as it is commonly described.

D'Alemberte, Commentary on § 1(g), art. VIII, Fla. Const., 26A F.S.A. 270, 271.

A non-charter county is a government of limited granted powers. It has only "such powers of self-government as is provided by general law or special law." Article VIII, § 1(f). The difference between county governments having only granted powers (non-charter counties) and county governments having all powers not inconsistent with general law (charter counties) is an advised one. Subsection (f) embodies new provisions enacted upon amendment of the state constitution in 1968. Commentary to § 1(f) at 270. The legislature created a Constitutional Revision Commission to conduct research, hold hearings and present a proposed constitution to the legislature. 1965 Laws of Florida Ch. 65–561. The draft was presented to the legislature. It contained a proposal for Article VIII, § 1(f) that "counties shall have the power of self-government except as otherwise provided by general or special law." Commentary to § 1(f) at 270. After a parliamentary battle the House amended § 1(f) to its present form. See Journal of the House of Representatives, June 27, 1968. The Senate retained the Revision Commission's recommendation. A conference committee submitted a proposed constitution containing § 1(f) as adopted by the House, and it was adopted by the legislature. See Journal of the House of Representatives, July 2, 1968. Summarizing, the Constitutional Revision Commission recommended general powers for non-charter counties, but the Florida legislature rejected the proposal and instead chose limited powers. This is summarized in the Commentary to § 1(f) at 270:

Subsection (f). This subsection embodies several new provisions which were proposed in a different manner by the Constitutional Revision Commission. That recommendation was that "counties shall have the power of self-government except as otherwise provided by general or special law." The reverse is now the case under this subsection which provides that counties shall have such powers of self government as is provided by general or special law. Absent special or general legislation counties have no constitutional powers under this subsection.

Until 1984 the at-large election system was the only method of election available to non-charter counties such as Leon. Fla. Const. Art. VIII, § 1(e). In that year the constitution was amended to permit commissioners to be elected "as provided by law." In 1985, § 124.011(1), Fla.Stat.1985 was enacted, the effect of which was to give non-charter counties the option of adopting an alternate method for electing county commissioners: a five-person board with all elected from single-member districts or a seven-person board with five elected from single-member districts and two elected at-large. For either of these procedures to be utilized, however, the proposition must be submitted to approval by the voters. The Leon County commissioners have not submitted such a proposal to the voters, i.e., an alternate plan (single-member or five-two) for the non-charter government of their county.

The commissioners did resort to the voters in search of authorization for a four-three mixed plan, but without success. A four-three plan is not permitted for a non-charter county but only for a charter county. A charter county may choose a four-three plan by amending its charter by popular vote. Fla. Const. art. VIII, § 1(c), (e) and commentary to § 1 at 269. In October 1985, while this case was pending and three weeks before trial and some eight months after the effective date of § 124.011(1) authorizing the commissioners to seek voter approval for a five-two plan, the district court granted the commissioners a continuance to allow them to submit to the voters a change from non-charter to charter government with commissioners to be elected pursuant to a four-three mixed plan. The voters rejected the change.[3]

Trial was reset for February 1986. In mid-January 1986 the commissioners tried again to hold off remedial court action. They moved for a second continuance ostensibly based on citizens' efforts to establish a consolidated government for Leon County. The request was denied.

### III. Analysis of the present case under the principles of *Wise*.

An examination of this case in terms of the factors, enumerated above, on which Justice White appeared to rest his conclusion in *Wise* leads me to conclude that the plan proposed by the Leon County commissioners was not a legislative plan as it was not enacted pursuant to the commissioners' authority but rather in derogation of their authority.

(1) and (2). This case *does* reveal state constitutional and statutory prohibitions upon the authority of a non-charter county to enact a plan in the manner followed by the Leon County commissioners. Leon County has no general or implied or "imbued" legislative powers. Florida has explicitly chosen to deny such powers to non-charter counties.

(3) and (4). There is no absence of means for the commissioners to pursue reapportionment under Florida law. In *Wise* the only legislative means of reapportionment was nullified when held unconstitutional. In this case only the old at-large system was struck down. The means to reapportion were in the hands of the commissioners beginning in January 1985, the effective date of § 124.011(1). Furthermore, there was no time crunch before the next election.

Rather than utilize the means available to them, however, the commissioners

<hr>

**3.** Plaintiffs have contended that this is a rejection of a plan remarkably similar to that proposed to the court and must be rejected for that reason. As the district court noted, however, it is not clear what the voters were rejecting. They may have desired single-member districts. They may have rejected a change to charter status for their county, or any mixed system, or a four-three mix when the law permitted a five-two mix. Or they may have expressed a prefer-

ence for the old at-large system even though it was unconstitutional.

But the district court's analysis overlooks a point. What must be determined is whether, even though the vote was not an outright rejection, the commissioners possess authority to change the election system. Whatever motivated the voters, the election result certainly did not confer upon the commissioners the authority to act in derogation of Florida law.

sought and obtained a delay from the court and went to the voters with a plan that under Florida law was not available to non-charter counties, coupled with a vote on switching from non-charter status to charter status. The avenue of § 124.011(1) was available then, and was available when the commissioners sought a second continuance ostensibly to permit citizens to pursue efforts toward a consolidated government for the county. It was available when the district court decided this case, it has been available during this appeal, and it is available now.

(5). The district court in this case addressed only tangentially, if at all, the Florida constitutional and statutory history set out above and the question of the effect of a Florida non-charter county's acting beyond its limited authority.

Moreover, it seems to me that even under Justice Powell's opinion the plan in this case cannot be treated as legislative. In *Wise* the legislative body had no express power to reapportion itself, but, as Justice White had noted, no provision of Texas constitutional or statutory law appeared to deny it that power. In this vacuum where there was no specific authority and no specific denial or rejection of authority, Justice White found implied ("imbued" as Justice Powell described it) authority. Justice Powell considered this finding not essential; rather, he thought it enough that the city commission "exercised a legislative judgment, reflecting the policy choices of the elected representatives of the people." *Wise*, 437 U.S. at 548, 98 S.Ct. at 2501. I believe that those following Justice Powell's opinion would not extend their reasoning to the situation before us where there was no vacuum of power, the means to reapportion had been granted and were available but were not utilized, and the constitution and statutes of the state denied all legislative powers except those expressly granted.

Federal courts defer to the actions of state legislative bodies that act within their powers because we recognize that they can act with "political authoritativeness" as the expositors of "state political goals." *Id.* at 541, 98 S.Ct. at 2498. But a legislative body does not act with "political authoritativeness" when it proceeds in derogation of the general political goals of the state as established for non-charter counties and eschews the specific and available political goals and procedures established for it. When a legislative body acts in this manner it is not free to make "policy choice[s] as elected representatives of the people" and it does not "perform[ ] in accordance with the political processes of the community." *Id.* at 545, 98 S.Ct. at 2500. Instead it is acting in the teeth of the legislative and policy choices made by those who adopted the state constitution and the implementing statutes. To assign the dignity of legislative status to the actions of the commissioners in such a case is antithetical to the reasons for giving deference to such actions and it stands federalism on its head.

### IV. The case law after *Wise*

The Fifth Circuit followed the analysis we have followed in a case involving a Florida non-charter county's acting in the absence of statutory authority.[4] *McMillan v. Escambia County*, 688 F.2d 960 (5th Cir.1982), *vacated and remanded on other grounds*, 466 U.S. 48, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984). The Fifth Circuit found the controlling analysis of *Wise* to be that in Justice White's opinion, i.e., a plan cannot be legislative if the body proposing it lacks the authority under state law to apportion itself. It reached this conclusion on the basis that the three dissenters would take Justice White's more restricted view of "legislative" rather than the more expansive view accepted by four justices in Justice Powell's opinion. In *McMillan*, as in this case, the commissioners of a Florida

---

**4.** Section 124.011(1) had not been enacted at the time of *McMillan* so the Fifth Circuit did not consider its impact upon a non-charter county's power to reapportion itself. The analysis re-
garding the lack of any inherent power to apportion itself, however, given a non-charter county's status as a governing body of limited powers, is the same.

county submitted to the voters a proposal to change to a charter form of government and to adopt a 5–2 mixed plan. The voters turned it down. The district court then ordered single-member districts. The court of appeals held:

> The Escambia County Commission is a non-charter government, and thus its legislative powers encompass only those specifically provided by state law. Defendants cite no state law empowering the Commission to reapportion itself, but contend that, under the analysis of *Wise v. Lipscomb, supra,* the Commission is implicitly vested with power to reapportion when the existing apportionment scheme has been held unconstitutional. We reject this argument because we are of the view that the district court correctly distinguished this case from *Wise.*

> \* \* \* \* \* \*

> The facts here are similar to those in *Wise* in that the only method authorized by state law for adopting a county election system that is not at-large is for the voters of the county to approve such a system by referendum. *See* text *supra* at 17. Unlike the Texas Constitution, however, the Florida Constitution expressly limits the legislative powers of the County Commission to those specifically authorized by state law. Hence, as the district court found, the Commission does not possess the legislative authority to reapportion itself even where the existing apportionment scheme has been held unconstitutional. On this ground, the district court correctly held that a judicially devised plan was necessary.

*McMillan,* 688 F.2d at 971–72. The Supreme Court vacated and remanded for reconsideration in light of the 1982 amendments to the Voting Rights Act. 466 U.S. 48, 104 S.Ct. 1577. I do not disagree with my brothers that the decision is not binding precedent. Considering *McMillan* as no more than, as Judge Hill puts it, "persuasive authority," we should follow it for the reasons I have set out: it properly distinguishes *Wise* in the context of a Flor-

ida non-charter county; it recognizes political interests at the heart of deference to legislative actions taken by a governmental body acting as it is required to do in a democratic system; and it vindicates the principles of federalism.

Our present case is not controlled by *McDaniel v. Sanchez,* 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981), nor does *Sanchez* imply that the Court adopted Justice Powell's *Wise* opinion. In *Sanchez* the Court addressed the question of what constitutes a legislative plan for purposes of preclearance under § 5 of the Voting Rights Act. The Court held that whenever a covered jurisdiction submits a proposal reflecting the policy choices of the elected representatives of the people, no matter how their power may be constrained by state law, such proposal is a legislative plan (Justice Powell's definition of a legislative plan) for purposes of the preclearance requirement of § 5. The Court explicitly distinguished the issue before it in *Sanchez* from the issue before the Court in *Wise:*

> In this case, we are concerned only with the question whether the reapportionment plan submitted to the District Court should be considered a legislative plan for purposes of preclearance under § 5. We are not presented with any question concerning the substantive acceptability of that plan. Nevertheless, we draw significant guidance from prior cases in which the substantive acceptability of a reapportionment plan, rather than the applicability of § 5, was at issue.

*Sanchez,* 452 U.S. at 139, 101 S.Ct. at 2231.

Nor can *Sanchez* correctly be said to "stand in contrast" to *McMillan.* They concern different issues, *Sanchez* with § 5 and *McMillan* with the substantive acceptability of a plan presented to a court. In *Sanchez* the court rendered no opinion as to the proper definition of a legislative plan in a case such as *Wise* or *McMillan* or the case now before this court. *McMillan* addressed the precise issue facing this court

and with facts that are as congruent as possible for facts to be. *Sanchez* did not address the issue we must decide, which is whether the same definition of legislative plan should apply in both a § 2 and a § 5 preclearance case.

The issue involved in a § 5 proceeding is different from that before us. Under § 5 the legislative body must demonstrate that the proposed plan is constitutional, that it was not motivated by a discriminatory purpose, and that it will not have an adverse impact on minority voters. A § 5 inquiry asks whether a legislature *can* enact a proposed plan; if the plan gets § 5 preclearance it *may* become effective. Section 5 does not address in any fashion questions of whether the legislative body acted legally under state law in fashioning a plan.

While a legislatively enacted reapportionment plan is the preferred remedy after a judicial finding of unconstitutional apportionment, I believe that the Supreme Court cases articulating this preference do not contemplate that a legislature can satisfy this responsibility—and therefore avoid the more stringent requirements applicable to court-ordered plans—by submitting a plan that not only has not been enacted pursuant to valid state procedures governing reapportionment but also has in fact been fashioned in derogation of those procedures. Justice Powell's opinion in *Wise* tells us, in effect, that a legislative body is free to act as representative of the people in a *de facto* fashion though it lacks specific authority to act. It is quite another thing to say that a legislative body acts as a representative of the people when it eschews the authority it possesses and proceeds on a course that state law has elected to deny to it.