John DILLARD, et al., Plaintiffs,

v.

CRENSHAW COUNTY, et al., Defendants.

Civ. A. No. 85–T–1332–N.

United States District Court, M.D. Alabama, N.D.

May 25, 1990.

James Blacksher, Birmingham, Ala., Julius L. Chambers, Scherlyn Ifill, NAACP Legal Defense Fund, New York City, Edward Still, Reeves & Still, Birmingham, Ala., for plaintiffs.

David R. Boyd, Balch & Bingham, Don Siegelman, Office of Atty. Gen., Montgomery, Ala., Frank Ellis, Wallace, Ellis, Head & Fowler, Columbiana, Ala., Raymond P. Fitzpatrick, Jr., Birmingham, Ala., T. Dudley Perry, Perry & Perry, Montgomery, Ala., David C. Johnson, Robert R. Black, Birmingham, Ala., for defendants.

## ORDER

MYRON H. THOMPSON, District Judge.

The plaintiffs in this class-action lawsuit are African–American citizens of Shelby County, Alabama, who claim that the at-large voting system used to elect the county's governing commission violates § 2 of the Voting Rights Act of 1965, as amended.[1] The defendant Shelby County Commission initially denied liability, but, after trial, voted to approve a settlement agreement with the plaintiffs that would change the method of election for the county commissioners. Subsequently, the commission voted to withdraw its support for the settlement and petitioned the court not to approve it. With exception of two members of the plaintiff class, the plaintiffs

---

1. 42 U.S.C.A. § 1973 et seq.

continue to advocate approval of the settlement.

This cause is now before the court on the issue of whether the court should adopt the recommendation of the special master that the settlement should be approved and enforced. For reasons set forth below, the court agrees with the special master.

## I.

Shelby County is located in north central Alabama. According to a 1988 special census, a total of 88,041 persons reside in the county. Of those, 7,085 or 8.05% are African-American. The population of the county has increased rapidly during the past ten years, with the white population growing more quickly than the black population. Therefore, although the number of black residents has increased, their percentage of the total population has decreased.

Shelby County is currently governed by a five-member commission consisting of four commissioners elected at-large and the county probate judge, who acts as the chairperson of the commission but votes only in the case of a tie. Although candidates for the county commission must run at-large, or county-wide, a candidate may run for only the commission position assigned to the residency district in which he or she lives. In an election, all voters in the county may vote for one candidate from each of the four commission residency districts.

The plaintiffs, who represent a class composed of all African-American citizens residing in Shelby County, have brought this lawsuit charging that the county commission's present at-large election system impermissibly dilutes the voting power of plaintiff class members.[2] Section 2 of the Voting Rights Act proscribes all forms of voting discrimination, including both governmental action taken with the "intent" of inhibiting a person's right to vote on the basis of race, and governmental action which has racially discriminatory "results." *Thornburg v. Gingles*, 478 U.S. 30, 44–45 & n. 10, 106 S.Ct. 2752, 2763 & n. 10, 92 L.Ed.2d 25 (1986); *McMillan v. Escambia County, Florida*, 748 F.2d 1037, 1046 (Former 5th Cir.1984). Shelby County initially denied that its electoral system violates § 2, and this case went to trial.[3] While the case was under submission, the parties were able to reach a settlement.

The plaintiffs and the Shelby County Commission then filed a joint motion asking the court to approve a consent decree which will change the size and structure of the county commission and the method of electing county commissioners. Under the plan proposed in the consent decree, the commission will be initially expanded from five to seven members, and the probate judge will no longer serve on the commission. Three new members will be appointed to the commission, at least one of whom will be black. The appointed commissioners will serve until 1992. The two current commissioners whose terms expire in 1990 will have to stand for reelection that year, but for terms lasting only two years.[4] The other two current commissioners will serve out their terms which are scheduled to expire in 1992. All positions on the commission will, therefore, be open in 1992. The 1992 election, according to the decree, will then take place under a single-member district scheme of between seven and nine districts, one of which will be a majority-black district.

The consent decree also contains provisions that will help to assure that the person on the commission representing the

**2.** This lawsuit is one among many *Dillard* cases brought in this court challenging the at-large election systems, and various features of those systems, used by cities, counties, and county school boards across Alabama. *See Dillard v. Baldwin County Board of Education*, 686 F.Supp. 1459 (M.D.Ala.1988) (tracing the history of the *Dillard* litigation).

**3.** Shelby County was one of the "Group A" *Dillard* jurisdictions, described in *Dillard v. Bald-*

*win County Board of Education*, 686 F.Supp. at 1461, which contested both liability and remedy.

**4.** The 1990 elections for these two commission seats will be pure at-large elections. That is, the residency requirement will not be in effect. Candidates may reside anywhere in the county, and voters from the entire county will be allowed to vote in the election.

black community has a full and fair opportunity to participate in all aspects of the commission and to serve in all capacities, including chairperson of committees and of the commission itself. The decree also requires the commission to hire four advisory staff members, one of whom must be black. The United States Department of Justice has "precleared" this plan pursuant to § 5 of the Voting Rights Act of 1965, as amended.[5]

United States Magistrate John L. Carroll, the special master in this case, conducted a "fairness" hearing on the proposed consent decree to consider whether any members of the plaintiff class had objections to the decree. Two African–American citizens of Shelby County voiced objections. In addition, the probate judge of Shelby County, Tommy Snowden, has filed a motion to have the decree set aside.[6] The magistrate held a separate hearing on Snowden's motion.

Subsequent to these hearings, one of the Shelby County commissioners changed his vote and the commission voted to withdraw its consent to the proposed settlement. The commission then notified the court of its withdrawal of consent and moved to be relieved of its settlement obligations. The magistrate held a hearing on the commission's motion.

As stated, the magistrate has recommended that the court reject all objections and motions made in opposition to the settlement and that the court approve and enforce the consent decree.

## II.

■ The importance of settlements in the resolution of class-action lawsuits in general, and in voting rights cases in particular, cannot be overstated. This court has repeatedly noted the judicial policy favoring settlement in these cases. *E.g., Dillard v. Town of Louisville,* 730 F.Supp. 1546 (M.D.Ala.1990); *Dillard v. Town of*

*Cuba,* 708 F.Supp. 1244 (M.D.Ala.1988); *see also Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984) (settlement generally favored as means of resolving class actions). However, the district court bears the heavy responsibility of ensuring that the proposed settlement is fair, reasonable, and adequate as to the entire plaintiff class. *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986). The court also has a duty to ensure that the settlement is not illegal, against public policy, or the product of fraud or collusion. *Bennett v. Behring Corp.,* 737 F.2d at 986; *United States v. City of Alexandria,* 614 F.2d 1358, 1361–62 (5th Cir.1980).[7] In evaluating the consent decree at issue here, the court will examine each of these concerns.

### A.

■ In reaching conclusions about the fairness, adequacy, and reasonableness of a settlement, a court should examine several factors, including: (1) the complexity, expense, and duration of the litigation; (2) the stage of the proceedings at which settlement is achieved; (3) the likelihood of success at trial; (4) the place of the proposed settlement within the range of possible recoveries; and (5) the substance and amount of opposition to the settlement. *Bennett v. Behring Corp.,* 737 F.2d at 986. The court may also consider the opinion of class counsel in assessing the settlement. *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Dillard v. Chilton County Board of Education,* 699 F.Supp. 870, 875 n. 6 (M.D.Ala.1988), *aff'd,* 868 F.2d 1274 (11th Cir.1989). Two members of the plaintiff class have objected to the adequacy of the proposed settlement, contending that more members of the black community should have been consulted and that the black commissioner should be elected right away rather than appointed.

---

5. 42 U.S.C.A. § 1973c.

6. The court has allowed Snowden to intervene.

7. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh

Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

■ Full consideration of the factors set forth above demonstrates that this settlement is fair, reasonable and adequate for the members of the plaintiff class and will fully remedy any § 2 violation. The terms of the Shelby County consent decree guarantee that an African–American will serve as an appointed member of the seven-member commission until 1992, and that thereafter the black voters of the county will have a full and fair opportunity to elect a representative of their choice. The decree also has provisions to help assure that the appointed black representative, as well as whoever is elected to replace him or her, will have a full and fair opportunity to participate in commission affairs. The decree provides not only that this person will serve on committees of the commission but that periodically he or she will also serve as chairperson of these committees, and even of the commission as a whole. Finally, the decree requires that one of the commission's advisory staff be black. The court is convinced, from its independent review of the decree, that the decree is fair, reasonable, and adequate from the perspective of the plaintiff class.[8]

This conclusion is reinforced by testimony at the fairness hearing from George Dailey, the plaintiff class representative, and Jerome Gray, the state field director of the Alabama Democratic Conference, a predominantly black political organization. They testified that the settlement was fair and should be approved. It is also noteworthy that only two members of the plaintiff class have objected. In addition, plaintiffs' counsel, who have successfully handled countless suits of this type, represented to the court that the settlement is reasonable, given the relative riskiness of the plaintiffs' position. The plaintiffs sought a system of either "cumulative" or "limited" voting for the county. Although this court

has approved such systems as part of a settlement, the court has not yet ordered such relief.[9] The plaintiffs therefore ran the risk of not prevailing in this lawsuit. Nevertheless, the consent decree's changes in the electoral system of Shelby County clearly achieve the major objective of this lawsuit: providing the African–American citizens of the county with a meaningful opportunity to participate in the governmental process and to elect a candidate of their choice.

Admittedly, the court was troubled initially by the fact that the settlement provides that a black commissioner shall be appointed rather than that black voters would elect someone of their own choosing. However, the provision requiring the appointment of three commissioners, including a black commissioner, is a temporary measure, which will last only until 1992 when single-member districts can be created. The court is of the opinion that this requirement is fair under the special circumstances presented.

### B.

The court now turns to the challenges mounted by the Shelby County Commission and Probate Judge Snowden against the consent decree. "Although the validity of [a] settlement is a matter of federal law," *Allen v. Alabama State Board of Education,* 816 F.2d 575, 577 (11th Cir.1987), the Eleventh Circuit has cautioned that, because a state agency "is a creature of state law and derives its capacity to act—respecting settlement agreements or otherwise—from state law," *id.,* the court *"might* adhere to ... state-made formalities concerning state board actions." *Id.* (emphasis added). *See also Schwartz v. Florida Board of Regents,* 807 F.2d 901, 905 (11th Cir.1987) (enforcement of settle-

---

**8.** The inquiry into whether a proposed settlement is fair, reasonable and adequate focuses on the members of the plaintiff class. Thus, in this phase of the court's inquiry, the objections concerning the fairness of the proposed settlement to Snowden and the county commissioners are not discussed. These objections are discussed instead in the part of this order which addresses whether the settlement is fraudulent, collusive, illegal, or against public policy.

**9.** *See, e.g., Dillard v. Town of Cuba,* 708 F.Supp. 1244 (M.D.Ala.1988) (limited voting scheme approved as § 2 remedy); *Dillard v. Chilton County Board of Education,* 699 F.Supp. 870 (M.D. Ala.1988) (cumulative voting scheme approved as § 2 remedy), *aff'd,* 868 F.2d 1274 (11th Cir. 1989).

ment agreement governed by principles of state contract law). In light of this caution from the appellate court, this court will consider not only those challenges to the consent decree grounded in federal law but those based on state law as well.

Probate Judge Snowden, who will lose his position as chair of the commission under the proposed settlement, contends that the decree is the product of collusion between the commissioners and the plaintiffs, and among the commissioners; that the settlement was negotiated and approved in a manner that violated several state laws; and that the terms of the settlement agreement violate various provisions of the state constitution and code. In addition, the Shelby County Commission argues that the settlement is not enforceable under Alabama contract law because one of the commissioners who originally voted for the decree was defrauded by the other commissioners, and because the decree was a product of mutual mistake by the parties.

1.

█ The essence of Snowden's collusion argument is that three Republican county commissioners—Steve Chambers, Howard Foster, and Kenneth Wilson—colluded with the plaintiffs to reach a settlement that would remove Probate Judge Snowden, a Democratic, from the commission. Snowden's argument is quite unlike the typical claim of a collusive settlement, which involves allegations that either named plaintiffs or plaintiffs' class counsel will benefit from the settlement at the expense of class members. *See, e.g., Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir.1983) (settlement agreement under which named plaintiffs would receive disproportionate share of backpay award suggests "cloud of collusion"). Because the collusion alleged here worked to the detriment of Snowden, not to any members of the plaintiff class, the case law provides little guidance for analyzing this claim. Therefore, the court will start its analysis with the definition of collusion:

> An agreement between two or more persons to defraud a person of his rights by

the forms of the law, or to obtain an object forbidden by the law. It implies the existence of fraud of some kind, the employment of fraudulent means, or of lawful means for the accomplishment of an unlawful purpose.

*Black's Law Dictionary* 240 (5th ed. 1979). Snowden contends that several of the commissioners colluded with the plaintiffs for the unlawful purpose of removing him from the commission.

The record shows, however, that the settlement of this case was the result of normal negotiations between the parties. Initially, the plaintiffs pursued a settlement that incorporated cumulative or limited voting and the commissioners advocated an agreement establishing a maximum of seven single-member districts. Various members of the county commission then met with each other, with Republican officials, and with the representatives of the plaintiffs in an attempt to hammer out an agreement. There was little if any specific discussion about removal of the probate judge from the commission because the plaintiffs made it clear that they would not accept a settlement in which the probate judge remained on the commission.

Commissioner Chambers spearheaded the movement toward settlement within the commission and conducted most of the negotiations with the plaintiffs. This conduct was explicitly permitted by a commission resolution which appointed Chambers and then-commissioner-elect Foster to meet with the plaintiffs "to attempt to find grounds for a settlement."[10] Snowden was present at the commission meeting where this resolution was passed and later attended at least one other meeting where settlement was discussed. All the other commissioners were fully aware that settlement discussions were ongoing, although they were involved in those discussions to varying degrees. Significantly, neither Snowden nor any of the commissioners testified that they requested and were denied the opportunity to participate in settlement discussions with the plaintiffs, or that the plaintiffs or any of the other commission-

**10.** Defendant–Intervenor's Exhibit 12 (hearing    held July 7, 1989).

ers refused to discuss ongoing negotiations.

The plaintiffs' desire to abolish the position of at-large chairperson filled by Snowden was motivated by the legitimate concern that a settlement which failed to do so might not completely remedy any existing § 2 violation. In *Dillard v. Crenshaw County*, 831 F.2d 246 (11th Cir.1987), the Eleventh Circuit wrote:

> Given that the chairperson would be elected and would work directly within the context of the elected body of associate commissioners, we agree with the district court that "the members elected by a racially fair district election method would have their voting strength and influence diluted."

*Id.* at 253, *quoting Dillard v. Crenshaw County*, 649 F.Supp. 289, 296 (M.D.Ala. 1986).

To be sure, political factors may have played a part in the Republican commissioners' agreement to this demand—that is, the three commissioners may have been motivated by the fact that the probate judge is a Democrat. However, whether political discrimination in these circumstances is legal or illegal is an issue the court need not reach.[11] Assuming that this type of discrimination is illegal and assuming further that the three commissioners were motivated by a desire to have the probate judge removed because he is a Democrat, the court is convinced by the evidence that Snowden's position would have been eliminated even in the absence of such motivation. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, ——-——, 109 S.Ct. 1775, 1788–90, 104 L.Ed.2d 268 (1989); *Mt. Healthy City School District Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The court

is convinced, and so finds, that the desire of the three commissioners to settle and reach a solution that would comport fully with § 2 was so strong that they would have reached the same agreement, irrespective of whether the probate judge is a Democrat, a Republican, or of another party. The court agrees with the special master that, irrespective of any political motivation, the commission would have settled this lawsuit for the following reasons:

> First, the commissioners who voted to settle all wanted to end the litigation and the uncertainty that it injected into the legislative process in the county. The attorneys for the commission had informed the commission that they would, in all likelihood, lose in the district court and that it would be necessary to seek relief from the appellate court. Second, the evidence without exception shows that the commissioners wished to ensure that the black citizens of Shelby County were given a realistic opportunity to elect a black commissioner and to enjoy full participation in the county government. Third, the commissioners wanted to adopt a district form of government which would make the individual commissioners more responsible to a particular segment of the population. Fourth, the commissioners wanted to avoid, at all costs, the imposition of a limited vote or cumulative vote remedy and they knew that the plaintiffs were seeking just such a remedy.

Magistrate's Recommendation, filed March 9, 1990, pp. 26–27. The proposed settlement was not the product of collusion.

### 2.

■ The consent decree does not violate Alabama law in any way that requires this

---

11. In *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), the Supreme Court held that "political gerrymandering" was justiciable. This decision could be further understood to teach that intentional discrimination is insufficient by itself to establish a constitutional claim of political discrimination. As the Court wrote, "even if a state legislature redistricts with the specific intention of disadvantaging one political party's election prospects, we do not believe that there has been an unconstitutional

discrimination." *Id.* at 139, 106 S.Ct. at 2813 (White, J., plurality opinion). "Rather," according to the Court, "unconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Id.* at 132, 106 S.Ct. at 2810 (White, J., plurality opinion). If the court were to apply this exacting standard to Snowden's claim of political discrimination, his claim would fail.

court to disapprove of the settlement. First, it is true that, although the settlement was approved at a public county commission meeting, the negotiations which resulted in the decree were conducted out of the public eye. Under the Alabama "sunshine" law, "No executive or secret session shall be held by any ... county commission ... except when the character or good name of a man or woman is involved." 1975 Ala.Code § 13A–14–2(a). The court need not determine whether the negotiation sessions between the plaintiffs and one or two members of the Shelby County Commission violated this law, however, because the Alabama Supreme Court has held that actions taken in violation of § 13A–14–2 are not void. *Floyd v. Alabama Historical Commission,* 388 So.2d 182, 188 (Ala. 1980); *Ex parte Alabama Public Service Commission,* 376 So.2d 665, 667 (Ala.1979); *Hargett v. Franklin County Board of Education,* 374 So.2d 1352 (Ala.1979). Therefore, any violation of the sunshine law that may have occurred would not invalidate the consent decree.[12]

■ Second, Snowden contends that the process by which the commission approved the consent decree violated the commission's own procedural rules. Resolutions of the Shelby County Commission require that all contracts be approved by the county attorney before being presented to the full commission and be signed by the commission chairperson.[13] Here, the consent decree was not approved by the county attorney, and the commission chairperson, Probate Judge Snowden, refused to sign the decree. The lack of approval from both the county attorney and the probate judge, however, did not invalidate the consent decree because such approval was unnecessary.

Consent decrees "have attributes both of contracts and of judicial decrees, a dual character that has resulted in different treatment for different purposes." *Local Number 93, IAFF v. City of Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 3073, 92 L.Ed.2d 405 (1986) (internal quotation omitted). In this case, the consent decree did not come within the class of "contracts" that required approval by the county attorney. The county attorney himself stated that the "settlement agreement is not the typical contract that I would have had in mind under that resolution that I should examine."[14] Moreover, it is apparent from the conduct of the commission members that they did not interpret their rules to require that settlements be approved by the county attorney and signed by the probate judge. Based on this evidence, the court similarly interprets and finds that the commission's rules did not require such approval and signature.

■ In any event, the testimony of the county attorney reflects that his intended role in "approving" contracts was limited to examining them for legal defects. It is thus apparent that the county attorney's role was technical, and that the absence of approval by him would not invalidate a contract. Similarly, it is evident that the requirement of the probate judge's signature on all contracts was merely ministerial in nature, intended to indicate or validate that the commission had approved a contract. The requirement of the probate judge's signature was not intended to give to the probate judge the authority to veto commission action by withholding his signature.[15] Thus, the absence of the probate

**12.** Snowden also contends that the consent decree was adopted in violation of the Alabama special meeting law which requires that "In cases where officers are to be appointed or vacancies supplied or any other special duty required by law to be performed, a special meeting must be held, by direction of the chairman of the county commission." 1975 Ala.Code § 11–3–9. This objection is without merit. Snowden has presented no evidence that approving the settlement of a lawsuit against the county is a "special duty" covered by the special meeting law. Moreover, it is apparent from

actions of those involved that no one viewed the law as covering a settlement. The court therefore holds that the law does not apply.

**13.** Defendant–Intervenor Exhibits 7 & 8 (hearing held July 7, 1989).

**14.** Transcript of hearing held July 7, 1989, at 195.

**15.** The resolution requiring the probate judge to sign all contracts is as follows:
 EFFECTIVE TODAY, ON ALL CONTRACT[S] OBLIGATING THE SHELBY COUNTY COM-

judge's signature in this case, assuming it was required, would be nothing more than a technical defect and would not warrant a finding that the decree was invalid.[16]

■ The commission also argues that the consent decree must be invalidated because it restructures the county government in a manner other than that prescribed by state statutory and constitutional law.[17] The Eleventh Circuit has held that a federal court may adopt and implement a change in the electoral structure of a county commission proposed by the members of that commission, even if the commission would not have the authority to implement that change under state law. *Tallahassee Branch of NAACP v. Leon County,* 827 F.2d 1436, 1437, 1440 (11th Cir.1987), *cert. denied,* 488 U.S. 960, 109 S.Ct. 402, 102 L.Ed.2d 391 (1988). Similarly, the settlement need not be disapproved because it sets forth the manner in which the commission is to form committees and hire administrative staff, provisions which the court arguably could not impose as remedies after a finding of liability. Federal courts have the authority to approve and enforce consent decrees in which the parties undertake obligations that the court could not impose. *Local Number 93, IAFF v. City of Cleveland,* 478 U.S. at 522–23, 106 S.Ct. at 3075.

> MISSION, THE COMMISSION VOTED UNANIMOUSLY THAT:
> 1. All contractu[]al agreements—rent or lease purchase must be approved in a regular Commission meeting, by the Commission upon approval of the County Attorney.
> 2. All contracts must be signed by the Chairman of the Commission rather than a department head.
> 3. An original copy of the approved contract will be kept in the Commission Office.
> Defendant–Intervenor's Exhibit 7 (hearing held July 7, 1989). The resolution reflects the ministerial nature of the probate judge's duty. Its purpose was simply to indicate that the authority to sign contracts approved by the commission resides with the probate judge "rather than a department head." As stated, the probate judge can vote on a measure only in the case of a tie. Snowden would have the court interpret this resolution to give him the additional power to veto all measures regarding contracts passed by the commission, even those passed unanimously. The court does not believe that the commission intended, by this simple resolution, to redefine the role of the probate judge on the com-

### 3.

Finally, the court will address the commission's contention that it should be allowed to withdraw from the proposed settlement. In *Allen v. Alabama State Board of Education,* 816 F.2d 575 (11th Cir.1987), the Eleventh Circuit held that the state school board was bound by the terms of a settlement even though the board never actually voted on the settlement, because the members of the board did not voice any objection when the officer presiding at the school board meeting told the board's attorney to "go ahead" and settle the case on the terms discussed. *Id.* at 576. "The fact that the board later changed its mind after unfavorable publicity does not change the fact that it had already approved the settlement and that the Board's attorney, with their consent, had notified the court of the settlement." *Id.* at 577. The Shelby County Commission denies that it simply "changed its mind" when it voted to withdraw the consent decree. Rather, the commission argues that it should be permitted to withdraw because the settlement agreement was a product of both fraud and mutual mistake and, therefore, is not enforceable under state contract law.

### (i)

Commissioner Foster, who originally provided the critical vote in favor of the commission so radically and to give him such expanded power over the actions of other commission members.

16. There is some authority in this circuit which could be read to suggest that a court has the authority to approve a consent decree supported by the majority of the commissioners even if the settlement was not enacted in accordance with state or local procedures. *Cf. Tallahassee Branch of NAACP v. Leon County,* 827 F.2d 1436 (11th Cir.1987) (district court must defer to reapportionment plan adopted by county commission as remedy in § 2 lawsuit, despite disapproval by voters in referendum required by state law), *cert. denied,* 488 U.S. 960, 109 S.Ct. 402, 102 L.Ed.2d 391 (1988).

17. Snowden makes a similar argument, contending that the proposed settlement should be disapproved as against public policy because it is an invalid attempt to restructure government in Shelby County in violation of state law. For the reasons discussed in the text, this "public policy" argument is without merit.

sent decree, has now changed his vote, giving the opponents of settlement a majority. The commission argues that its vote to withdraw consent to settlement is valid because Foster was fraudulently induced to vote in favor of the settlement.

■ Foster claims that Commissioner Wilson fraudulently induced him to vote in favor of the settlement agreement by giving the impression that the proposal was "a take it or leave it situation" from the plaintiffs rather than a negotiated settlement and that the commission's chances of winning the lawsuit had decreased dramatically as a result of the Eleventh Circuit's summary affirmance of the district court decision in *Dillard v. Baldwin County Board of Education*, 694 F.Supp. 836 (M.D.Ala.1988), *aff'd* 862 F.2d 878 (11th Cir.1988) (table).

Foster contends that he would not have voted for the settlement if he had known that Wilson had been "negotiating" with the plaintiffs, because there were some aspects of the settlement he "definitely would not have allowed to stand" during negotiations.[18] The fact that Foster received an erroneous impression from Wilson, without any evidence that Wilson made any false or misleading statements, or intended to deceive Foster, cannot support a finding that the consent decree resulted from fraud.

■ Foster also complains that, during their discussion of the settlement agreement, Wilson predicted that the Eleventh Circuit's decision in the *Baldwin County Commission* case had significantly diminished the Shelby County Commission's chances of winning this lawsuit. Although Foster does not contend that Wilson claimed to be recounting a lawyer's assessment of the case, Foster says that he relied on his own impression that Wilson's prediction did come from one of the Shelby County Commission's lawyers. Foster's misapprehension is insufficient to support a finding of fraud. Foster learned about the consent decree two days before the meeting in which the decree was approved.

During that time he could have arranged to speak with any of the commission's three lawyers about the *Baldwin County Commission* case or about the general advisability of the proposed settlement.

■ Finally, the court is convinced, and so finds, that Foster's testimony about the alleged fraud is not credible. Foster does not claim that Wilson, or anyone else, affirmatively misrepresented the terms or circumstances of the proposed settlement. He contends instead that he received erroneous impressions from what Wilson said. The court is convinced that Foster fully and accurately understood the settlement and the negotiation process that led up to it. From the beginning to the end of the negotiation process, Foster was aware that the process was ongoing and was involved intermittently in settlement discussions. He and Commissioner Chambers were members of the committee originally appointed to negotiate with plaintiffs. Moreover, after this committee was disbanded and Wilson and Chambers took over settlement negotiations, Foster was presented with the proposed settlement agreement and fully informed of its content. Foster had access to all those directly involved in the settlement process as well as to the commission's attorneys. Foster's contention that he was misled is disingenuous.

### (ii)

■ The commission's contention that it should not be bound by the settlement agreement because it was a product of a mutual mistake is equally unavailing. The commission argues that the parties entered into the consent decree with the understanding that a single-member district with a black majority could be formed using between seven and nine districts. The consent decree provides that, once the 1990 census data is available, the plaintiffs will draw a majority-black district and the commission will draw the other six to eight districts.

Demographer Rod Clark testified that he was unable to draw a district in a nine-member districting plan that had a black

18. Transcript of hearing held November 27, 1989, at 100.

population majority using the special 1988 census data.[19] The 1990 census will yield more precise data because the blocks of population will be smaller. However, Clark testified that even with this more precise data, "I still don't feel like you will be able to create a nine-member plan with a black majority ... without cutting off somebody else. You are going to start creating islands all over the place."[20] The plaintiffs claim that they will be able to draw a district in a nine-member plan with a black majority. In addition, plaintiffs' counsel has represented to the court that his understanding of the consent decree is that the plaintiffs are to draw a majority-black district or, in the alternative, their best "influence" district using the 1990 census data.[21]

Under Alabama law, a party may rescind a settlement agreement based on a claim of mutual mistake only if the parties entered into the agreement in reliance on an "erroneous belief ... relat[ing] to the facts as they exist[ed] *at the time of the making of the contract....* [A] party's prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here." *Boles v. Blackstock,* 484 So.2d 1077, 1082 (Ala.1986) (emphasis in original) (*quoting Restatement (Second) of Contracts* § 151, Comment (a) (1979)). The consent decree provision contested by the commission was formulated in reliance on the *prediction* that the data obtained in the 1990 census would enable the plaintiffs to construct a majority-black district, not on any facts that existed in March of 1989. The commission's allegation that this prediction now appears to be erroneous does not, as a matter of law, support a claim for rescission of the consent decree based on mutual mistake. *Boles v. Blackstock,* 484 So.2d at 1082.

Moreover, the court finds the testimony of the commission's demographer not to be probative of this issue. The commission has always been aware that it might be difficult to draw a majority-black district. The commission nevertheless entered into the settlement without consulting its demographer. Now, in an effort to get out of the settlement, the commission has come up with evidence—which it apparently could have obtained before it even entered into the settlement—that a majority-black district cannot be drawn using 1990 census data. The court must reject this evidence for two reasons. First, to allow the commission to succeed with its effort would defy all notions of fairness. The commission specifically agreed to wait until the 1990 census to determine whether a majority-black district could be drawn. The commission therefore decided, as did the plaintiffs, not to rely on predictions as to what 1990 census data might hold. To accept prediction testimony at this time regarding the 1990 Census would be contrary to the consent decree. Second, it is apparent that the testimony on which the commission asks that this court rely is purely speculative. The demographer testified that he "feels" a majority-black district cannot be drawn. He also generalizes that creating such a district will create "islands." It is evident that the demographer has not made the detailed analysis necessary to conclude with reasonable certainty what the population figures will look like in 1990. In light of the unreliability of the demographer's testimony and in light of the dubious circumstances under which the commission has suddenly come forward with his testimony, the court does not find the demographer's testimony credible. The court believes it is best to wait until the 1990 census—as all parties intended and agreed in the consent decree—to attempt to draw a majority-black district. This was

---

**19.** Transcript of hearing held November 27, 1989, at 21. Clark testified that using the 1988 data the greatest black percentage he had been able to get in a district for a nine-member system was 31.6%.

**20.** Transcript of hearing held November 27, 1989, at 22.

**21.** Plaintiffs' counsel advanced this interpretation of the consent decree at the March 19, 1990, hearing on the plaintiffs' motion for interim relief.

what the parties bargained for, and this is what they should get. The consent decree will be approved.

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That the recommendation filed by the United States Magistrate on March 9, 1990, be and is hereby adopted;

(2) That defendant-intervenor Tommy Snowden's motion to set aside the consent decree, filed April 6, 1989, be and is hereby denied;

(3) That defendant Shelby County Commission's motion to be relieved of settlement obligations, filed October 10, 1989, be and is hereby denied;

(4) That the objections to the consent decree voiced by plaintiff class members John Deviner and Pauline Sears at the "fairness" hearing on April 28, 1989, be and are hereby overruled;

(5) That the parties' joint motion for approval of settlement, filed March 28, 1989, be and is hereby granted; and

(6) That the consent decree submitted by the parties be and it is hereby approved and enforced.

It is further ORDERED that the plaintiffs have and recover from defendant Shelby County Commission their reasonable attorney's fees, and that the plaintiffs be and are hereby allowed until the completion of all the *Dillard* cases to file their request for attorney's fees.

It is further ORDERED that costs be and are hereby taxed against defendant Shelby County Commission, for which execution may issue, and that plaintiffs be and are hereby allowed until the completion of all the *Dillard* cases to file their bill of costs.